IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Criminal No. 5:11-cr-00044** |
| **v.** | ) | |
| | ) | **By:    Michael F. Urbanski** |
| **BARNETT SOUTHALL DILLMAN,** | ) | **Chief United States District Judge** |
| **JR.,** | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on defendant Barnett Southall Dillman, Jr.'s motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF No. 194. The government has responded in opposition, ECF No. 201, and Dillman has replied. ECF No. 202. For the reasons stated herein, the court will **GRANT** Dillman's motion for compassionate release and reduce his sentence to time served.

## I.

From 2001 to 2011, Dillman distributed a large quantity of drugs, including phencyclidine ("PCP"), crack cocaine, and marijuana, in Prince George's County, Maryland, and Warren County, Virginia. Def.'s Sentencing Mem., ECF No. 87, at 2. Dillman was part of a conspiracy "of more than a dozen individuals who would join together to obtain these drugs for their own use and redistribution." Guilty Plea Factual Basis, ECF No. 53, at 1. Dillman first began selling drugs when he was 15, both to earn money to pay for food and clothes and to pay for his own marijuana use. Def.'s Sentencing Mem., ECF No. 87, at 5. In 2000, Dillman started selling drugs as a street dealer near his family's residence in Bladensburg, Maryland. <u>Id.</u> Following the deadly shooting of Dillman's brother, David, during a drug robbery in front of

Dillman's house in 2005, Dillman stopped selling drugs on the street and began to sell drugs from the backyard of his parents' residence. Id. In 2006, Dillman's acquaintance and fellow drug distributor Bart Peele died from complications from a gunshot wound he received in 2000 while selling drugs near Dillman's residence. Guilty Plea Factual Basis, ECF No. 53, at 1. After Peele's death, Dillman acquired Peele's customer base in Front Royal. Id.

Dillman's drug operation was a habitual practice. Each evening at around 7:00 p.m. or 8:00 p.m., Dillman would turn on his cell phone to receive calls from his customers. Id. at 2. If Dillman agreed to a sale, the customer would meet Dillman in his parents' backyard, where he would then sell PCP, crack cocaine, marijuana, and other drugs. Id. Dillman usually turned off his phone and finished the day's sales between 4:00 a.m. and 5:00 a.m. Id. Throughout the conspiracy, Dillman supplied multiple kilograms of both crack and PCP to the conspiracy. Id. Between October 2009 and November 2011, various law enforcement agencies made seven controlled buys from Dillman. Id. Throughout the conspiracy, Dillman also possessed multiple firearms, some of which he allegedly offered to sell to his customers. Id. Presentence Investigation Report ("PSR"), ECF No. 101, at 4–5, 7–8, 10.

On March 31, 2006, Peele's sister smoked PCP allegedly obtained from Dillman. Gov't Sentencing Mem., ECF No. 89, at 2. While high, she was involved in two motor vehicle accidents. Id. at 6. The first accident occurred after she swerved out of her lane of travel and hit the front left corner of another vehicle. Id. After an off-duty police officer approached the accident, she "abruptly took off in the wrong direction, heading east in the westbound lanes of I-66 without headlights." Id. Her vehicle then hit a car head on, killing a passenger instantly.

Id. As a result of the vehicular homicide, Peele's sister was sentenced to 15 years in prison. Id. at 7.

On October 7, 2009, Thomas Lewis, Dillman's co-defendant, was high on PCP that allegedly came from Dillman. Id. at 8. Lewis, 16 years old at the time, robbed another juvenile at knife point. Id. He then stole a car and fled from Virginia State Police on I-66, ultimately ramming a police cruiser. Id.

On September 15, 2011, a customer purchased one-half ounce of PCP from Dillman for the purpose of committing suicide. Def.'s Sentencing Mem., ECF No. 87, at 7. The customer drank the PCP and was found unconscious in the basement of his parents' home. Id. The customer was taken to the hospital and treated. Id. According to the emergency room doctor, the customer did not face a substantial risk of death from his overdose. Gov't Sentencing Mem., ECF No. 89, at 2.

On November 29, 2011, Dillman was arrested for conspiring to distribute 280 grams or more of cocaine base and 1000 grams or more of PCP. See ECF Nos. 1–3. On December 14, 2011, Dillman was indicted on one count ("Count One") of possession and distribution of one kilogram or more of PCP and 280 grams or more of crack cocaine, the use of which resulted in serious bodily injury of another, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Indictment, ECF No. 11. The "serious bodily injuries" referenced the attempted suicide by Dillman's customer and the death of the car passenger who crashed with Peele's sister while she was high on PCP allegedly supplied by Dillman. Gov't Sentencing Mem., ECF No. 89, at 1–2. Dillman pleaded not guilty to Count One on December 15, 2011. ECF No. 13. On April 19, 2012, the grand jury issued a superseding indictment, which added co-defendant Thomas

Steven Lewis. ECF No. 24. On August 23, 2012, the government notified Dillman of its intent to enhance punishment pursuant to 21 U.S.C. § 851, based on a prior felony drug conviction. ECF No. 43.

On August 27, 2012, Dillman pleaded guilty to Count One via a written plea agreement. ECF No. 52. The agreement included an amendment of Count One of the Superseding Indictment which removed the following language: "the use of which resulted in serious bodily injury of another." Id. Dillman also agreed that the charges had a mandatory minimum sentence of 20 years and a maximum sentence of life in prison. Id.

According to Dillman's PSR, his base offense level was 32. ECF No. 101 at 10. He received a 2-point enhancement for the presence of firearms and a 3-point enhancement for being a career offender[1] because of three prior felony convictions.[2] Id. Dillman received a 3-point reduction for acceptance of responsibility, making his total offense level a 34. Id. Dillman fell into a criminal history category VI because of his status as a career offender.[3] Id. Dillman was subject to a minimum term of imprisonment of 20 years and a maximum term

---

[1] PSR, ECF No. 101, at 10 ("Since the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense, the defendant is a career offender. U.S.S.G. § 4B1.1.").

[2] The first felony offense was for possession with intent to distribute cocaine on July 26, 2002. Id. at 11. For this offense, Dillman was sentenced to 1 year of imprisonment and 1 year of supervised probation. Id. The second felony offense was for possession with intent to distribute cocaine on July 23, 2005. Id. at 12. For this offense, Dillman was sentenced to 5 years of imprisonment with all but 4 days suspended and 2 years of supervised probation. Id. The third felony offense was for distribution of cocaine on September 8, 2005. Id. Dillman was sentenced to 1 day in jail. Id. This third felony offense "was corrected at sentencing to be a possession of cocaine offense, and not a distribution offense," leaving just the first two felony offenses to support the career offender enhancement. Mot., ECF No. 194, at 2.

[3] Based on Dillman's total criminal history score, his original criminal history category was IV. However, because of Dillman's status as a career offender, his criminal history category was increased to VI. Def.'s PSR, ECF No. 101 at 12.

of life in prison. Id. at 16. Based upon Dillman's offense level of 34 and his criminal history category of VI, his sentencing guidelines range was 262 to 327 months. Id. The United States recommended "a sentence well above the guideline range" because "the facts of this case radically diverge in the most painfully human and catastrophic way from a heartland case." Gov't Sentencing Mem., ECF No. 89, at 17.

On April 24, 2013, Dillman was sentenced to 420 months of incarceration. ECF No. 103 at 226. The court explained that a guidelines range was not sufficient in this case due to "the large scale nature of [Dillman's] drug dealing, the large amount of drugs he moved in Maryland and Virginia over the course of the last decade, the violence associated with it, [and the] presence of firearms[.]"Hr'g Tr., ECF No. 133, at 224. The court noted that "[n]othing less will protect the public from future crimes of the defendant. Nothing less will provide deterrence or result in a just sentence." Id. at 226. On April 25, 2015, Dillman's sentence was reduced to 210 months pursuant to a motion from the government. Order Reducing Sentence, ECF No. 143.

On June 29, 2015, Dillman filed a pro se motion for a reduction in his sentence pursuant to Amendment 782 to the Sentencing Guidelines, which allows defendants to seek a two-level reduction of their sentences if their sentencing guidelines range has subsequently been lowered. Pro Se Amendment 782 Mot., ECF No. 145, at 1–2. On July 30, 2015, the court denied Dillman's motion, noting he was "ineligible for a reduction because his total offense level and resulting custody range were produced by the career offender guideline, which is unaffected by Amendment 782[.]" Order Denying Pro Se Amendment 782 Mot., ECF No. 146, at 1.

5

On July 19, 2019, Dillman filed a Rule 36 motion[4] seeking to correct clerical errors in his PSR and to resentence him to time served based on the corrected PSR. Mot. to Amend PSR, ECF No. 178. Dillman argued that "[a]lthough the three convictions identified as the predicates for the career offender classification are felony controlled substance offenses, they cannot be used as predicates because they were not committed prior to the instant offense of conviction in this case." Id. at 4. Because Count One charged Dillman for being part of a drug conspiracy that started in 2001 and lasted nearly a decade, Dillman argued that the three prior convictions occurred after the commencement of the instant offense and "cannot be the basis of a career offender classification."[5] Id. at 5. If Dillman had not been classified as a career offender, he believed that he would be classified in criminal history category II. Id. "For the same reason, the § 851 enhancement is without foundation because 21 U.S.C. § 841(b)(1)(A) applies when the instant offense is committed *after* the prior felony drug conviction." Id. at 5–6 (emphasis in original). Dillman would, therefore, be subject to a 10-year mandatory minimum, not a 20-year mandatory minimum. Id. at 6. Dillman advocated for a corrected sentencing guideline range of 121 to 151, with a 50 percent reduction per the government's previous motion, making his actual sentencing range 60.5 to 75.5 months. Id.

On December 24, 2019, the court denied Dillman's motion to correct his PSR because his proposed corrections were substantive, not clerical. ECF No. 184. The court reasoned that "[a]lthough Dillman couches his arguments in terms of clerical errors, the essence of his

---

[4] Federal Rule of Criminal Procedure 36 states, "After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Crim. P. 36.

[5] Dillman cites to U.S.S.G. § 4B1.2(c), which states that "two prior felony convictions" means that "the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense."

argument is that the convictions should not have been used as a basis for the career offender designation, the § 851 enhancement, or the Guidelines calculation." Id. at 8. Accordingly, the court denied Dillman's motion. Id. Dillman filed a notice of appeal, ECF No. 186, and the Fourth Circuit granted Dillman's subsequent motion for abeyance pending the resolution of his current motion for compassionate release before this court, ECF No. 195.

Dillman seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A), arguing that he was erroneously sentenced as a career offender and that this error constitutes an "extraordinary and compelling" reason warranting a sentence reduction. Mot., ECF No. 194, at 1. Dillman argues that he should have been sentenced with an offense level of 34, minus three points for his acceptance of responsibility, and with a criminal history category of III. Id. at 3. If Dillman had been sentenced according to that offense level and criminal history category, his guideline range would have been 135-168 months. Id. at 3–4. Dillman argues that he should not be subject to a career offender enhancement because "[t]he offense dates of the two career offender predicates . . . are squarely within the scope of the conspiracy." Id. at 4. If Dillman had not been classified as a career offender, he also would have received a 2-point reduction in his guideline range because of Amendment 782. Id. at 5.

Further, Dillman argues that today he would not be subject to enhanced punishment under § 841(b)(1)(A). Id. at 6. In order to enhance a sentence under § 841(b)(1)(A), the First Step Act now requires that the predicate conviction be a "serious drug felony," as defined by 21 U.S.C. § 802(57), rather than a mere "felony drug offense," as defined at 21 U.S.C. § 822(44). To qualify as a "serious drug felony," the First Step Act now requires that "the offender served a term of imprisonment of more than 12 months." 21 U.S.C. § 802(57). While

Dillman served one year for one of his felony convictions, he did not serve more than one year for any of his convictions. Mot., ECF No. 194, at 6. Today, Dillman's sentence would not be subject to enhancement and he would no longer be required to serve a mandatory 20-year sentence. Indeed, the statutory minimum for a § 841(b)(1)(A) sentence is now 10 years. If Dillman were sentenced today, he asserts that his guideline range would be 108-135 months. Id. at 10-11. A 128 percent increase[6] from 135 would be 172 months. Id. at 11. With Dillman's 50 percent reduction per the government's motion, his sentence would be 86 months. Id.

Dillman argues that this change in mandatory minimum sentences and his erroneous classification as a career offender constitute extraordinary and compelling circumstances justifying a sentence reduction. As such, Dillman seeks a reduction of his sentence to time served. Id. at 11. The government opposes any sentence reduction for Dillman. ECF No. 201.

## II.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

---

[6] The 128 percent increase reflects the upward variance from the 327 months of the maximum end of Dillman's original sentencing guidelines calculation to the 420 months that were imposed.

> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, Dillman's requested relief requires the court to consider: (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate after considering the applicable 18 U.S.C. § 3553(a) factors.

i.   Dillman has fully exhausted his administrative remedies.

The provision allowing defendants, in addition to the Bureau of Prisons ("BOP"), to bring motions under § 3582(c) was added by the First Step Act to "increas[e] the use and transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5239 (2018). Before bringing a motion before the district court, a petitioner must first exhaust his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A). A petitioner must satisfy one of two conditions, whichever is earlier: (i) "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or (ii) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility[.]" Id.; see also United States v. McCoy, 981 F.3d 271, 283 (4th Cir. 2020). The first condition requires that the defendant fully exhaust all administrative rights. This means that it is not enough for the warden to respond within 30 days by denying the request for compassionate release. If the warden denies the request within 30 days, the petitioner must then exhaust all administrative appeals available through the BOP. The second condition can only be met after the lapse of 30 days from when the warden received the petitioner's request and has not responded. Though the exhaustion requirement is a mandatory claim-processing rule, the government

may waive or forfeit its satisfaction. See United States v. Alam, 960 F.3d 831, 834 (6th Cir. 2020); see also United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).

Here, Dillman requested compassionate release from the warden of his facility on May 27, 2020. BOP Letter, ECF No. 194-2, at 4. The warden denied Dillman's request on June 8, 2020. Id. at 1. Dillman then filed a motion for compassionate release with this court on August 20, 2020. Mot., ECF No. 194. The government does not contest that Dillman has exhausted his administrative remedies. Mem. in Opp'n, ECF No. 201. Accordingly, the court finds that Dillman has satisfied the statute's exhaustion requirements.

ii.  Dillman presents extraordinary and compelling reasons to warrant a sentence reduction.

The court must next consider if it should "reduce the term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). The U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13 application notes state that "extraordinary and compelling reasons" exist where (A) the defendant is suffering from a terminal or serious medical condition; (B) the defendant is over 65 years old, has failing health, and has served at least ten years or 75 percent of his sentence, whichever is less; (C) the caregiver of the defendant's minor child dies or becomes incapacitated, or the defendant's spouse or partner becomes incapacitated and the defendant is the only available caregiver; or (D) as determined by the Director of the BOP, for "other reasons" than, or in combination with, those described in Application Notes (A)-(C). Id. at cmt. n. 1(A)-(D).

In its original form, § 3582(c) only allowed the Director of the BOP to initiate a motion for compassionate release. In other words, the BOP served as a gatekeeper for whether a district court could consider such a motion. Section 603(b) of the First Step Act amended § 3582(c)(1)(A) to allow individual defendants, in addition to the BOP, to file a motion with the

district court for a reduction in their sentence. See First Step Act of 2018, Pub. L. 115-391, 132 Stat 5194. While U.S.S.G. § 1B1.13 and its applications notes were first effective on November 1, 2006, and amended numerous times since, they have remained unchanged since the passage of the First Step Act.[7] Most notably, the policy statement still requires the BOP to serve as the gatekeeper for initiating compassionate release motions. See U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons . . . the court may reduce a term of imprisonment[.]"). Similarly, application note (D) still only allows the BOP to determine what other extraordinary and compelling reasons exist beyond those enumerated in application notes (A)–(C). See U.S.S.G. § 1B1.13, cmt. n. 1(D).

Because the policy statement in § 1B1.13, as currently written, is inconsistent with the First Step Act, the application notes are unpersuasive and not binding on the court. McCoy, 981 F. 3d at 281. In McCoy, the Fourth Circuit held that "[w]hen a defendant exercises his new right to move for compassionate release on his own behalf . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." Id.; see also Stinson v. United States, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with . . . that guideline."). The government argues that "Congress expressly granted to the Sentencing Commission (not the courts) the power to determine what constitutes a sufficient ground for compassionate release." Mem. in Opp'n, ECF No. 201 at 6. But the Fourth Circuit explicitly rejected this argument in McCoy.

---

[7] See United States Sentencing Commission, Guidelines Manual, Appendix C, Amendments to the Guidelines Manual, Amendment 683, available at https://guidelines.ussc.gov/ac/683 (last visited July 8, 2021).

981 F. 3d at 284 ("'Nothing in § 3582(c)(1)(A)(i) requires courts to sit on their hands' if there is a gap in Commission policy.") (quoting <u>United States v. Rodriguez</u>, 451 F. Supp. 3d 392, 400 (E.D. Pa. 2020)). "[W]here the Commission fails to act, then courts make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language, which 'directly instructs <u>courts</u> to "find that" extraordinary circumstances exist.'" <u>Id.</u> (quoting <u>Rodriguez</u>, 451 F. Supp. 3d at 400) (emphasis in original). Therefore, the court will consider whether Dillman has demonstrated extraordinary and compelling reasons to warrant a reduction in his sentence, including reasons other than those enumerated in the application notes to § 1B1.13.

Dillman argues there are two extraordinary and compelling circumstances warranting a reduction of his sentence. First, he argues that if he were sentenced today, he would not qualify as a career offender because of the amendment to the sentence enhancement provisions under the First Step Act. Mot., ECF No. 194, at 6. Second, he argues that he should not have been classified as a career offender at the time of his sentencing because the two prior felony convictions used to classify him as a career offender were relevant conduct to his charge in Count One. <u>Id.</u> at 5. The government argues that Dillman has not met his burden of establishing that extraordinary and compelling reasons warrant his release. Mem. in Opp'n, ECF No. 201, at 11. Its arguments are grounded in a pre-<u>McCoy</u> understanding of this court's capabilities under the First Step Act. Notably, in objecting to Dillman's Rule 36 motion, the government did not "concede or assert…that the Court made any type of error in calculating or imposing the original sentence in this case." ECF No. 181 at 1 n. 1.

First, Dillman argues that if he were sentenced today, he would not qualify as a career offender. Because neither of Dillman's previous convictions qualify as a "serious drug felony" under the amended law, if he were sentenced today, he would not face a sentence enhancement. The court agrees with Dillman that the substantial changes under the First Step Act constitute an extraordinary and compelling reason to warrant a sentence reduction.

When Dillman was sentenced, § 841(b)(1)(A) provided for an enhanced penalty of mandatory life imprisonment if the defendant committed certain drug conspiracy violations "after two or more prior convictions for a felony drug offense ha[d] become final." 21 U.S.C. § 841(b)(1)(A) (2010). Section 401 of the First Step Act made two relevant changes to the enhanced penalty of § 841(b)(1)(A): first, it required that the defendant have two prior serious drug felony convictions for the enhancement to apply; and second, it reduced the penalty for those defendants to a 25-year mandatory minimum, instead of life. See 21 U.S.C. § 841(b)(1)(A) (2018). Today, to satisfy the "serious drug felony" requirement, the defendant must have served a term of imprisonment of more than 12 months on each of the prior offenses. See 21 U.S.C. § 802(57); 18 U.S.C. § 924(e)(2).

Here, if Dillman were sentenced today, he would not qualify as a career offender. See United States v. Norman, 935 F.3d 232, 237–39 (4th Cir. 2019). He served one year for possession with intent to distribute cocaine in 2002, and he served four days for possession with intent to distribute cocaine in 2005. PSR, ECF No. 101, at 11–12. Even though Dillman served one year for his first conviction, he argues that "to qualify as a 'serious drug felony' today, he would have had to serve more than one year." Mot., ECF No. 194 at 6 n. 2 (emphasis in original). And Dillman's four-day sentence for his second conviction was clearly less than a

year. Accordingly, Dillman would not be sentenced as career offender today and would be subject to a mandatory minimum of 10 years, not a mandatory minimum of 20 years. See 21 U.S.C. § 841(b)(1)(A) (2018).

The government argues that because Congress did not make § 401 of the First Step Act retroactive, Dillman does not have a valid basis for compassionate release on account of extraordinary and compelling reasons and that "Dillman's request would severely undermine the plain goals of the Sentencing Reform Act to reduce disparity in sentencing and to afford offenders, victims, and the public a clear understanding at the time of sentencing of the actual punishment imposed." Mem. in Opp'n, ECF No. 201 at 15, 22. The government is correct that the changes to § 401 of the First Step Act were not made explicitly retroactive, while other sections were made retroactive. See, e.g., First Step Act of 2018, Section 404, Pub. L. 115-391, 132 Stat 5194 (making changes to the Fair Sentencing Act of 2010 retroactive). As such, the First Step Act did not grant Dillman, and all other similarly situated defendants, an automatic reduction in their sentence. Rather, as with changes to the 18 U.S.C. § 924(c) "stacking" penalties, where § 403 of the First Step Act likewise did not automatically apply, it is up to the courts to make an individualized assessment of a defendant seeking a reduction in his sentence. See United States v. Redd, 444 F. Supp. 3d 717, 721 (E.D. Va. 2020) (noting that the "First Step Act increased the opportunity for defendants to obtain a reduction in their sentence based on an individualized consideration under designated criteria.").[8] The same applies for § 401 of

---

[8] In United States v. Arey, No. 5:05-cr-00029, 2020 WL 2464796, at *5 (W.D. Va. May 13, 2020), this court agreed with Redd, finding that "[w]hile the First Step Act § 403(a) did not make this change retroactive, many district courts have reasoned that the First Step Act's change in how sentences should be calculated when multiple § 924(c) charges are included in the same indictment constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)." (internal citations omitted).

the First Step Act—while Congress did not make the changes to § 841(b)(1)(A) automatically retroactive, the court can consider the amendments, in addition to undertaking an individualized examination of each defendant, in determining if the circumstances warrant a reduction in his sentence under § 3582(c)(1)(A). See id. ("Nor does the First Step Act's lack of retroactivity justify withholding sentencing relief given the overall purpose of the First Step Act amendments, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.").

In McCoy, the Fourth Circuit held that "the district courts permissibly treated as "extraordinary and compelling reasons" for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act." 981 F.3d at 286. Its analysis focused on "two distinct features" of the sentences, including their "sheer and unusual length" and the "gross disparity" between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." Id. at 285. The Court's analysis is just as applicable to changes in sentencing career offenders, and at least one member of this court has already held that changes in career offender guidelines constituted an extraordinary and compelling circumstance justifying a sentence reduction. United States v. Trice, No. 7:13CR00034-001, 2021 WL 402462, at *3 (W.D. Va. Feb. 3, 2021). Because Dillman's statutory mandatory minimum at the time of sentencing was double what it would be if he were sentenced today, the court finds that extraordinary and compelling reasons exist to reduce Dillman's sentence.

Second, Dillman argues that he should not have been classified as a career offender at the time of his sentencing. When Dillman was sentenced, § 841(b)(1)(A) provided for an enhanced penalty if the defendant committed certain drug conspiracy violations "after two or more prior convictions for a felony drug offense ha[d] become final." 21 U.S.C. § 841(b)(1)(A) (2010). The two prior convictions used to classify Dillman as a career offender were possession with intent to distribute cocaine convictions on July 26, 2002, and July 23, 2005. PSR, ECF No. 101, at 11. Because the instant charge deals with a conspiracy that lasted from 2001 to 2011, Dillman argues that these two convictions were "relevant conduct to the conspiracy" and "cannot be used as career offender predicates." Mot., ECF No. 194, at 4−5; see also U.S.S.G. § 4B1.2(c) (stating that "two prior felony convictions" means that "the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense").

The court agrees with Dillman that it was a mistake to designate him as a career offender because the two predicate offenses used to establish Dillman's status as a career offender were part of the instant conspiracy. See, e.g., United States v. Gross, 199 F. App'x 219, 244 (4th Cir. 2006) (unpublished) ("[A]s a general rule, where a defendant has prior convictions that were based on conduct that later forms the basis of a federal conviction, such prior convictions cannot be used for a career offender enhancement because of the relatedness of the underlying conduct."). The mistaken assertion that Dillman was a career offender clearly affected the guidelines range given to Dillman and his eligibility for an Amendment 782 reduction.

To be sure, Dillman's challenge to his original sentence is not properly brought as part of a compassionate release motion. As district courts around the country have acknowledged, sentencing errors are addressed through objections to the PSR, direct appeals, and habeas petitions, not compassionate release motions. See, e.g., United States v. Vasquez-Lopez, No. CR-13-01513-001-PHX-GMS, 2020 WL 2220116, at *1 (D. Ariz. May 7, 2020) ("[The defendant's] assertion of an erroneous application of an adjustment under the Sentencing Guidelines falls under 28 U.S.C. § 2255, which authorizes the Court to vacate, set aside, or correct the sentence on the ground that it was imposed in violation of the law."); United States v. Lisi, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) ("[T]he Court believes that it would be both improper and inconsistent with the First Step Act to allow Lisi to use 18 U.S.C. § 3582(c)(1)(A) as a vehicle for claiming legal wrongs, instead of following the normal methods of a direct appeal or a habeas petition.").

Still, because the court has found other grounds for compassionate release, the court will not ignore and perpetuate its error should it find that a sentence reduction is appropriate after considering the § 3553(a) factors. See United States v. Williams, 423 F. Supp. 3d 259, 263 (W.D. Va. 2019) ("This case differs from Black in that no objection was made to the PSR and Williams did not file a direct appeal or seek collateral review. Nevertheless, the parties agree that it was a mistake to find that his conviction was a violation of § 922 (g) and designate him as an Armed Career Criminal for purposes of U.S.S.G. § 4B1.4(a).... It serves no purpose to perpetuate a mistake in the name of consistency. Indeed, doing so would only mean that the court was consistently wrong."); see also United States v. Collington, 995 F.3d 347, 355 (4th Cir. 2021) ("Accordingly, we both allow and require more of a sentencing judge in the First

Step Act context[, here under § 3582(c)(1)(B),] than the § 3582(c)(2) context. First, district courts must accurately recalculate the Guidelines sentence range. Second, and relatedly, district courts must correct original Guidelines errors and apply intervening case law made retroactive to the original sentence.") (emphasis in original) (internal citations removed).

iii.     A sentence reduction is appropriate after considering the § 3553(a) factors.

Having found that extraordinary and compelling reasons exist to warrant a reduction in Dillman's sentence, the court must consider if a reduction is consistent with the applicable § 3553(a) factors. See 18 U.S.C. § 3582(c)(1)(A). Those factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. See 18 U.S.C. § 3553(a). Here, the § 3553(a) factors weigh in favor of a sentence reduction.

As discussed above, Dillman pleaded guilty to possessing PCP and cocaine with intent to distribute. Dillman argues that he signed the guilty plea and was sentenced with the possibility of a mandatory life sentence, the impact of which "cannot be overstated."[9] Mot., ECF No. 194, at 11. Additionally, Dillman notes that before his arrest for this federal offense,

---

[9] In its sentencing memorandum, the government stated that Dillman could have been required to serve a mandatory life sentence for three separate reasons. ECF No. 89 at 1. The first way "was a drug conspiracy with bodily injury (substantial risk of death), and a prior drug trafficking felony." Id. The second way "was the resulting vehicular death of Rawand Hirezi, a 23 year old college senior a[t] George Mason University." Id. at 2. The third way was "the combination of drug weight and prior felony convictions." Id.

he "had served only 1 year, 5 months, and 10 days incarcerated for all of his prior convictions combined. He has now served 9 years, a substantial increase." Id. at 12. Dillman notably had a tough childhood and "often went without food, heat, electricity, or proper clothing" because his parents spent most of their money on drugs. Def.'s Sentencing Mem., ECF No. 87, at 3. He started using marijuana at age 11 and began selling drugs at age 15 "to earn money for foods and clothes for himself and his brother" and to pay for his marijuana use. Id. at 3−4. Dillman stopped attending school in ninth grade and told the court at his guilty plea hearing that he could not read and write in English. Id. at 4. While Dillman "simply did not have the ability to make rational decisions after almost 20 years of drug abuse, and without any education[,]" Dillman argues that he "has now demonstrated rehabilitation in the Bureau of Prisons by taking courses in drug education, relapse management, and anger control." Id. Dillman has only incurred two minor infractions in the last nine years, and none since 2016, and he notes that "[h]e has also worked hard towards getting his GED over these last years." Id. Dillman also notes that, if released, he would be able to care for his father, who "was just hospitalized for two weeks, a significant portion of which was in the intensive care unit," and his father "remains on a breathing machine." Notice and Request for Ruling, ECF No. 205, at 1.

The government argues that the § 3553(a) factors weigh against release because Dillman was involved in "a large-scale, multistate phencyclidine and cocaine distribution conspiracy that lasted over a decade and led to the death of [a] twenty-three year old college student, an overdose, and violent shootings." Mem. in Opp'n, ECF No. 201, at 23. The government also points to Dillman's lengthy criminal history and his possession of firearms

19

in connection with his drug distribution activities. Id. While the government acknowledges that Dillman has a minor prison disciplinary history, it finds that the other § 3553(a) factors weigh against Dillman's release.

The court agrees with Dillman and finds that the § 3553(a) factors weigh in favor of a sentence reduction. The court appreciates the efforts that Dillman has made to improve himself while in prison and finds that such a reduction is not inconsistent with the need to afford specific and general deterrence. The court finds that a shortened sentence, correctly applying today's guidelines, still reflects the severity, length, and magnitude of his criminal conduct. If sentenced today, with the benefit of Amendment 782, Dillman's base level offense would be a 30. Dillman received a 2-point increase for possession of a firearm in connection with his offense. He also received a 3-point reduction for acceptance of responsibility. Accordingly, if sentenced today, his total offense level would be a 29. Accurately reflecting which offenses should count towards the conspiracy and which should count towards his prior criminal history, Dillman's criminal history category today would be a III. Accordingly, his guidelines range would be 108-135 months. At the time of sentencing, the court varied upwards by 128 percent from the high end of the guidelines range. The court acknowledged then that the sentence imposed was above the guidelines range but noted that the "3553(a) factors, given this case and these facts, demand a sentence in excess of the guidelines." Hr'g Tr., ECF No. 133, at 226. Applying this same upward variance, the court today would sentence Dillman to 172 months. The court previously reduced Dillman's sentence by half pursuant to a motion from the government. Applying this same reduction, Dillman's sentence should be 86 months, or 124 months shorter than his current sentence. Dillman has already served,

considering good time credit, the equivalent of 135 months. <u>See</u> Notice and Request for Ruling, ECF No. 205. For these reasons, the court finds that the § 3553(a) factors weigh in favor of reducing Dillman's sentence.

### III.

For these reasons, the court will **GRANT** Dillman's motion for compassionate release, ECF No. 194, and reduce his sentence to time served.[10] The clerk is directed to send a copy of this memorandum opinion and accompanying order to the petitioner, his counsel of record, and the United States. An appropriate order will be entered.

It is so **ORDERED**.

Entered:    July 20, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.07.20 00:42:38
-04'00'

Michael F. Urbanski
Chief United States District Judge

---

[10] The court notes that, in reducing Dillman's sentence to time served, it is not awarding Dillman any "banked" time to reflect the difference between the 86-month sentence he would receive if sentenced today and the roughly 135 months he has already served. As a matter of policy, if prisoners granted relief through compassionate release were allowed to "bank" time on overserved sentences to offset terms of incarceration following revocation of supervised release, it would provide a disincentive to obey the terms of supervised release. This court does not believe such a result is consistent with the federal sentencing scheme.